**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**Karen Buckley et al.,**

          **Plaintiffs,**

    **v.**

**Dollar General Corp.,**

          **Defendant.**

    **Case No. C2-CV-04-483**
    **JUDGE GREGORY L. FROST**
    **Magistrate Judge King**

**ORDER**

Plaintiffs Karen Buckley ("Buckley") and Paula Knight ("Knight") allege that Defendant Dollar General Corporation[1] fired them because of their gender in violation of 42 U.S.C. § 2000e *et seq*., Ohio Revised Code Chapter 4112 and Ohio public policy.  (Doc. # 1).  Defendant moves for full summary judgment (Doc. # 25).  Briefing on that motion is now complete and for the reasons that follow the Court **DENIES** the motion in part and **GRANTS** the motion in part. (Doc. # 25).

Dolgencorp also filed a motion to strike (Doc. # 31) as well as a motion for sanctions (Doc. # 34).  Buckley filed a memorandum in opposition to Dolgencorp's motion to strike (Doc. # 32), to which Dolgencorp replied (Doc. # 33).  The Court finds the motion to strike as well as the motion for sanctions to be not-well taken and thus **DENIES** both of those motions.

---

[1] Defendant Dollar General Corp. maintains that Dolgencorp, Inc. employed Plaintiffs and not Dollar General Corp. (Doc. # 25 at 1 n.1).  As such, Defendant asserts that Dolgencorp, Inc. is the proper party Defendant.  *Id.*  Plaintiffs fail to disagree, so the Court will refer to "Dolgencorp" as Defendant throughout this motion.  Plaintiffs are **ORDERED** to file an amended complaint within five (5) days of this Order that names Dolgencorp., Inc. as the Defendant in this matter.

## BACKGROUND

Buckley and Knight are Ohio residents. (Doc. # 1 ¶ 1).  Dolgencorp operates a number of discount stores located across the United States, including Ohio.  *Id.* at ¶ 2.  Dolgencorp is a Tennessee corporation with its principal place of business in Tennessee.  *Id.*

On July 9, 1999, Dolgencorp hired Buckley as a cashier for their store located in The Plains, Ohio.  (Buckley Dep. 19, 22-23).  Dolgencorp promoted Buckley to assistant manager of that store almost one year later.  *Id.* at 56.  As assistant manager, Buckley was in charge of the store whenever the store manager was not present.  *Id.* at 62-63.  Around May 19, 2001, Dolgencorp promoted Buckley to store manager.  *Id.* at 74.  In that position, she was responsible for managing inventory and store personnel, presenting merchandise, protecting company assets, and ensuring a safe working environment.  *Id.* at 76.

Knight's career path was slightly different than Buckley's.  Originally hired as a temporary employee, Dolgencorp asked her to become a cashier at their store in Logan, Ohio on January 21, 2000.  (Knight Dep. 18, 23, 31-32, 84-85).  She accepted and Dolgencorp subsequently promoted her to third key–in other words, she became the lead clerk at the Logan store.  *Id.* at 34.  Around September 23, 2000, Dolgencorp transferred her to its store in Nelsonville, Ohio where she retained her position as third key.  *Id.* at 35-36, 87-88.  On May 26, 2001, Dolgencorp transferred Knight again, this time to the same store where Buckley worked–The Plains location.  *Id.*  Dolgencorp then promoted her to assistant manager of The Plains store under Buckley.  *Id.*  At that time, Bruce Beard ("Beard") was the district manager who oversaw The Plains store.  *Id.* at 44-45, 89, 91, 94-95.

In the Spring of 2002, Tim Veach ("Veach") replaced Beard as the district manager who

2

oversaw The Plains store.  (Knight Dep. 45; Buckley Dep. 33; Veach Dep. 34-36).  It is then that the alleged problems began.  Buckley  maintains that when Veach visited the store he ignored her but instead spoke with male employees who were not in management positions.  (Buckley Dep. 34, 36-40).  Veach stated that he and Buckley had a falling out during a conversation regarding recovery and that their relationship subsequently deteriorated.  (Veach Dep. 127).  He characterized Buckley's attitude towards him as "negative."  *Id.* at 127, 130.  Buckley admitted that after her disagreement with Veach she stopped making an effort to speak with him when he came to the store.  (Buckley Dep. 38).   Knight asserts that Veach did speak to her when he visited The Plains store but that he spoke to her like she was a "nobody" and that it "disgusted" him to speak with her. (Knight Dep. 97-110, 143, 150).  Veach described his relationship with Knight as "professional" and neither good nor bad.  (Veach Dep. 130).

Both Buckley and Knight were aware of Dolgencorp's policies relative to protecting inventory and assets.   (Buckley Dep. 48-49; Knight Dep. 81).  Specifically, they knew that failure to protect Dolgencorp's inventory and assets were "violations for which even the first offense may lead to progressive counseling and/or termination from [Dolgencorp]."  (Buckley Dep. 48-49 and Ex. 5; Knight Dep. 81 and Ex. 6).   Additionally, Plaintiffs knew that Dolgencorp considered "shrink"–loss or shortage of inventory–to be a serious problem. (Buckley Dep. 49-50; Knight Dep. 82).  For certain, shrink was repeatedly addressed at management meetings.  *Id.*  As members of management, Plaintiffs were responsible for keeping shrink levels consistent with Dolgencorp's expectations.  (Buckley Dep. 50-51, 64, 73; Knight Dep. 94-95).

Dolgencorp hired Washington Inventory Company to conduct an inventory of The Plains

store which it did on September 27, 2002.  (Buckley Dep. 88, 91, 108; Knight Dep. 111).

Essentially, the company's employees, along with Buckley and Knight, counted items and

punched the information into computers.  (Buckley Dep. 101-102; Knight Dep. 116-117).

Although Veach was present during the inventory, he did not participate.  (Veach Dep. 110;

Buckley Dep. 92).

An employee of Washington Inventory Company provided the results of the inventory to

Veach.  (Buckley Dep. 95-96).  The results indicated that The Plains store had a shrink level of

more than $70,000, or approximately 4.3% of the store's inventory.  (Buckley Dep. 95-98;

Knight Dep. 121; Sweat Dep. 57).  Veach discussed the results with both Buckley and Knight.

(Buckley Dep. 96-99; Knight Dep. 119-120).  They were both in shock when Veach told them

about the level of loss.  (Buckley Dep. 97; Knight Dep. 121).  Knight characterized the loss as

"humongous."  (Knight Dep. 139).  Later that day, Buckley spoke to Veach about the security of

her job in light of the results of the inventory.  (Buckley Dep. 100; Veach Dep. 132).

Thereafter, Veach informed Tina Sweat ("Sweat"), Dolgencorp's regional manager

whose territory included The Plains store, about the results and they decided to conduct an audit

of The Plains store.  (Veach Dep. 125; Sweat Dep. 40).  Dolgencorp's standard procedure

required an audit after an inventory revealed a high shrink level in a store.  (Sweat Dep. 39-40;

Sirb Dep. 7).  An audit would reveal whether managers were complying with company policies.

(Sweat Dep. 50, 64; Sirb Dep. 64).  Veach telephoned Buckley and told her that The Plains store

would be audited on October 10, 2002.  (Buckley Dep. 106-108).

Sweat had Asset Protection Supervisor Terry Sirb ("Sirb") conduct the audit.  (Sweat

Dep. 41-42; Sirb Dep. 7).  Sirb had previously conducted approximately 250-300 audits for

Dolgencorp in his role as asset protection supervisor. (Sirb Dep. 145). Sirb arrived at the store on October 10, 2002 and followed his normal audit protocol. *Id.* at 151-152. First, he proceeded to the office where he reviewed paperwork for about 30 to 45 minutes. Next, he met with Buckley and then walked with her through the store while he identified concerns and addressed Dolgencorp's policies. (Buckley Dep. 109-111; Sirb Dep. 157). During and immediately after the audit Sirb recorded his observations of whether the store was following Dolgencorp's policies. (Sirb Dep. 151-153). Sirb's audit consisted of two parts–an asset protection audit and a safety audit. (Sirb Dep. 159). Veach did not participate in the audit. (Veach Dep. 152, 260; Sirb Dep. 152).

After he completed the audit, Sirb discussed the results with Veach. (Sirb Dep. 131). Sirb also sent a copy of his report via e-mail to Mike Hegerich ("Hegerich"), his boss, as well as to Sweat and Employee Relations Coach Sharon Hager ("Hager"). (Sirb Dep. 81, 115-122; Hager Dep. 7). That e-mail indicated that the audit's results were "pretty bad." (Sirb Dep. 81 and Ex. 1). Sirb's audit revealed twenty-three (23) violations of Dolgencorp policy that "may have" contributed to the high shrink levels at The Plains store. (Sirb Dep. Ex. 1; Sweat Dep. 64).

Shortly after receiving Sirb's e-mail, Veach, Sweat, and Hager met to discuss the audit's results. (Veach Dep. 137-139, 253; Sweat Dep. 47-50). Part of Hager's job duties as Employee relations coach required her to participate in discussions with regional and district managers on employee termination matters. (Hager Dep. 12-13). Although Hager did not specifically recall Plaintiffs' termination at her deposition, she did testify that she would have worked with Veach and Sweat in making the decision to terminate Plaintiffs. *Id.* at 11, 14, 18. Sweat testified that she worked with Veach and Hager in deciding to terminate Buckley, but that she could not

remember whether she participated in the decision to terminate Knight.  (Sweat Dep. 47-50, 98).

Veach first testified that he did not share his opinion that the Plaintiffs should be terminated with

Sweat and Hager because of the "conflict" between him and Buckley.  (Veach Dep. 138).  Veach

later contradicted himself when he testified that he told Sweat and Hager that he did not think

that Plaintiffs were very good managers.  *Id.* at 144.   Veach also admitted that he agreed with

Sweat when she indicated that she thought that the Plaintiffs should be fired.  *Id.* at 141.  Veach

also testified that he had no authority to terminate Plaintiffs, and that Sweat and Hager made the

decision to fire them.  *Id.* at 140-144, 149.  Ultimately, the decision was made to terminate the

Plaintiffs.

Veach met with Buckley on October 26, 2002.  *Id.* at 149-150 & Ex. 3.  He informed her

that she was being fired because of the results of the audit.  *Id.*  Buckley signed her termination

form "under duress."  *Id.* at Ex. 3.  Veach met with Knight that same day and informed her of

Dolgencorp's decision to terminate her because of the audit.  *Id.* at 150-152 & Ex. 9.

Subsequently, Plaintiffs filed charges of gender discrimination with the Ohio Civil Rights

Commission ("OCRC").  *Id.* at Exs. 4, 7.  The disposition of those charges was unclear.

Additionally, Buckley filed a charge with the United States Equal Employment Opportunity

Commission ("EEOC") and received a right to sue letter.  (Doc. # 1 at ¶ 20).  Knight also filed a

charge with the EEOC. (Knight Dep. 146, Ex. 12).

This action followed.  In Count I of the Complaint, Buckley alleges that Dolgencorp

terminated her because of her sex in violation of  Title VII.  (Doc. # 1).  In Count II, Buckley and

Knight assert a gender discrimination claim under Ohio Rev. Code Chapter 4112.  *Id.*  Lastly,

Plaintiffs assert in Count III that Dolgencorp wrongfully terminated them in violation of Ohio

public policy. *Id.*  Dolgencorp moves for summary judgment on all of Plaintiffs' claims.


## DISCUSSION

### I.    PLAINTIFFS' MOTION FOR AN ORAL ARGUMENT

Pursuant to S.D. OH Civ. R. 7.1(b)(2), Plaintiffs move the Court to conduct an oral argument on Dolgencorp's motion for summary judgment.  (Doc. # 26 at 1, 28).  Because Plaintiffs fail to state the grounds for her request and because the Court concludes that oral argument would not be helpful, the Court **DENIES** Plaintiffs' motion.  (Doc. # 26).

### II.   DOLGENCORP'S MOTION TO STRIKE AND MOTION FOR SANCTIONS

It is indeed unfortunate that the Court finds itself having to rule on a motion to strike and a motion for sanctions.  However, given the level of banter that has transpired among the parties in this case, the Court is not surprised to find itself in this position.

#### A.    MOTION TO STRIKE

Dolgencorp moves the Court to strike thirty-one (31) "material facts that are unsupported by the cited record evidence."  (Doc. # 31 App. A).  Plaintiffs urge the Court to deny this portion of Dolgencorp's motion to strike by arguing that the Court is permitted in make reasonable inferences from the citations to the record in Plaintiffs' memorandum in opposition to Dolgencorp's motion for summary judgment in Plaintiffs' favor.  (Doc. # 32 at 1).

The Court **DENIES** Dolgencorp's motion to strike contained within Appendix A as moot.  The Court is more than capable of discerning whether the citations accurately reflect the record.  The Court will disregard the citations that have failed to be accurate; thus, the Court will not consider the inaccurate citations in ruling on the motion for summary judgment. (Doc. # 31).

Next, Dolgencorp moves the Court to strike "material facts premised on inadmissible hearsay, and of which witnesses lack personal knowledge." (Doc. # 31 App. B). Plaintiffs fail to directly respond to this portion of Dolgencorp's motion. (Doc. # 32). Once again, however, the Court is capable of discerning what constitutes hearsay and what does not. The Court has reviewed the record and has not considered proffered evidence that relies on hearsay. Consequently, the Court **DENIES** Dolgencorp's motion to strike the items listed in Appendix B as moot. (Doc. # 31).

Finally, Dolgencorp asks the Court to strike "material facts that are conclusory arguments or summary statements." (Doc. # 31 App. C). The Court is able to determine what constitutes conclusory arguments and what constitutes fact. The Court has reviewed the record and has not considered statements that are unsupported by the evidence. As a result, the court **DENIES** Dolgencorp's motion as moot. (Doc. # 31).

### B.    MOTION FOR SANCTIONS

Dolgencorp urges the Court to impose sanctions on Plaintiffs pursuant to Fed. R. Civ. P. 11. (Doc. # 34). Dolgencorp asserts that Rule 11 requires Plaintiffs to have evidentiary support for their factual contentions. Id. at 4. Based on their motion to strike, Dolgencorp maintains that Plaintiffs failed to do so and that sanctions are therefore warranted. (Doc. # 34).
The Court **DENIES** Dolgencorp's motion (Doc. # 34) because the Court denied Dolgencorp's motion to strike.

### III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52). However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

## IV.  Plaintiffs' Claims Under Title VII and Ohio Revised Code Chapter 4112

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions or privileges of

9

employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C.

§ 2000e-2(a)(1).  Similarly, Ohio Revised Code § 4112.02(A) provides:

> It shall be an unlawful discriminatory practice:
> (A) For any employer, because of the race, color, religion, sex, national origin,
> disability, age, or ancestry of any person, to discharge without just cause, to
> refuse to hire, or otherwise to discriminate against that person with respect to hire,
> tenure, terms, conditions, or privileges of employment, or any matter directly or
> indirectly related to employment.

Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed

violation of Title VII are likewise applicable in determining whether a violation of Ohio Rev.

Code § 4112.02 has occurred.  *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999)

(citing *Little Forest Med. Ctr. v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio

1991)); *see also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights

Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)).  Thus, the federal case law governing Title VII

actions is generally applicable to cases involving alleged violations of Chapter 4112 and the

Court will examine Buckley's Title VII and Ohio Revised Code Chapter 4112 claims

concurrently with Knight's Ohio Revised Code Chapter 4112 claim.  *Noble v. Brinker Int'l, Inc*.,

391 F.3d 715, 720 (6th Cir. 2004); (Doc. # 1).

  In a Title VII action the plaintiff has the burden of proving a *prima facie* case by a

preponderance of the evidence. *Thurman v. Yellow Freight Sys., Inc*., 90 F.3d 1160, 1166 (6th

Cir. 1996); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991).  In order to

establish a *prima facie* case of gender discrimination under Title VII, a plaintiff must show that

(1) she was a member of a protected class; (2) she suffered an adverse employment action; (3)

she was qualified for the position; and (4) she was treated differently from similarly situated

members of the unprotected class or she was replaced by someone outside the protected class.

*Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 456-457 (6th Cir. 2004); *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002).

A plaintiff may establish a *prima facie* case of discrimination either through direct evidence of intentional discrimination or through circumstantial evidence giving rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Terbovitz v. Fiscal Court of Adair County, Ky.*, 825 F.2d 111, 114-15 (6th Cir. 1987). Direct evidence takes the form of an employer telling an employee that the employee was fired because of his disability, age, race or sex. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a fact finder to draw a reasonable inference that discrimination occurred. *Wexler,* 317 F.3d at 570 (6th Cir. 2003) (citing *Kline*, 128 F.3d at 348).

Direct evidence and the *McDonnell Douglas* formula comprise "two different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir.1985); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997) (explaining that "the direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both").

In this case, Plaintiffs claim to have presented only circumstantial evidence of discrimination. (Doc. # 26 at 12-24). Thus, "the evidentiary framework of *McDonnell Douglas* is the proper mode of analysis." *Blalock v. Metals Trades*, 775 F.2d 703, 707-708 (6th Cir. 1985). The McDonnell Douglas framework places the initial burden of establishing a *prima*

*facie* case of discrimination on the plaintiffs. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff's burden of establishing a *prima facie* case is "not onerous" and is a "burden easily met." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 1999); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 254. Once the plaintiffs establish a *prima facie* case by a preponderance of the evidence, an inference of discrimination arises. *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728-29 (6th Cir. 1999).

Next, the burden shifts to the defendant to rebut the presumption by offering a legitimate, nondiscriminatory reason for the plaintiffs' discharge. *McDonnell Douglas*, 411 U.S. at 802. The defendant need not persuade the court that it was "actually motivated by the proffered reasons" but the "explanation provided must be legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 254-55. To meet its burden, the defendant must clearly articulate, through the introduction of admissible evidence, the nondiscriminatory reasons for its employment decision. *Id.*

The plaintiffs must then respond by demonstrating, by a preponderance of the evidence, that the defendant's proffered reason for the discharge is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-804. If the plaintiffs have made their *prima facie* case and presented sufficient evidence for a reasonable jury to reject the defendant's asserted justification for its actions, then the case should be submitted to the fact finder "to determine whether intentional discrimination has occurred." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

### A. *Prima Facie Case*
The parties agree that Plaintiffs, as females, were part of a protected group and that they

12

were subjected to an adverse employment action–termination. *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). Defendant contends, however, that both Plaintiffs fail to satisfy the third *prima facie* element and that Knight cannot satisfy the fourth *prima facie* element. (Doc. # 25 at 18-19; Doc. # 30 at 5).

### 1. Were Plaintiffs qualified for their positions with Defendant?

As proof of its contention that Plaintiffs were not qualified for their positions with Dolgencorp, the company directs the Court's attention to the fact that The Plains store had a high shrink level and poor audit results. (Doc. # 25 at 18). Specifically, the audit revealed that Plaintiffs violated 23 separate policies and procedures of Dolgencorp. *Id.* According to Dolgencorp, then, Plaintiffs were not qualified for their job because they were not satisfying Dolgencorp's legitimate expectations.

Dolgencorp's argument in this regard is familiar because it is also Dolgencorp's alleged nondiscriminatory reason for terminating Plaintiffs. This argument proves unavailing, as a court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Wexler v. Whites Furniture*, 317 F.3d 564, 574 (6th Cir. 2003). To do so, according to the Sixth Circuit, would "bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.*

Instead, the evidence establishes that Plaintiffs were qualified for their jobs. Buckley received favorable evaluations, and Dolgencorp promoted her twice. (Buckley Dep. 66-75, 78-81; Sweat Dep. Exs. 3, 4). Likewise, Knight received positive evaluations and Dolgencorp promoted her two times. (Knight Dep. 85-91). Dolgencorp did not discipline either Plaintiff

13

during their employment.  Because the evidence establishes that the Plaintiffs were doing their jobs well enough to satisfy Dolgencorp's legitimate expectations, the Court holds that Plaintiffs have satisfied the third element of their *prima facie* case.  *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991).

### 2. Did Dolgencorp treat Knight differently than similarly-situated male employees or did Dolgencorp replace Knight with a man?

Dolgencorp asserts Knight did not satisfy the fourth element of *prima facie* case because Dolgencorp did not replace her with a man.  (Doc. # 25 at 19; Doc. # 30 at 5-6).  Dolgencorp states that Katie Wolf, a woman, replaced Knight.  *Id.*  Furthermore, Dolgencorp indicates that "at no time after Knight's termination of employment did a man take over the position of Assistant Manager at The Plains store."  *Id.*  Knight does not contest this, and also fails to offer any evidence that Dolgencorp failed to fire male managers whose stores had high levels of shrink and poor audit results.  (Doc. # 26 at 13-15).

From this, it may appear that Knight has failed to establish the fourth and final element of her *prima facie* case.  To the contrary, the Sixth Circuit held:

> It is true that,  in typical disparate treatment cases, this Court applies the McDonnell Douglas four-part test for a *prima facie* case and has held that the fourth element of the test is satisfied with evidence that a similarly-situated person outside the protected class received more favorable treatment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (applying Ohio law). It does not follow, however, that the plaintiff necessarily must submit such comparative evidence in order to establish a *prima facie* case. The Supreme Court has explained that "the facts necessarily will vary in [discrimination] cases, and the specification ... of the *prima facie* proof required ... is not necessarily applicable in every respect to different factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13; accord *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981) (noting that the standard for establishing a *prima facie* case "is not inflexible") (citing *McDonnell Douglas*, 411 U.S. at 802 n.13); *Furnco Constr.*

> *Corp. v. Waters*, 438 U.S. 567, 577 (1978) (noting that the *McDonnell Douglas* method for providing disparate treatment "was never intended to be rigid, mechanized, or ritualistic"); *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 590 n.1 (6th Cir. 2003) ("It is worth noting that the Supreme Court [in *McDonnell Douglas*] did not intend its discussion [of the *prima facie* case] to limit the ways in which a plaintiff could establish a *prima facie* case."). Thus, for example, there may be cases where there is so much evidence of a decision-maker's discriminatory animus that a plaintiff's failure to satisfy the fourth element of the McDonnell Douglas *prima facie* case is not fatal to her claim. Cf. *id.* (hypothesizing that, even if the plaintiff could not demonstrate the fourth *prima facie* element of his failure to promote claim, he might well have been able to make out a case of disparate treatment for the jury "had there been a wealth of circumstantial evidence of discriminatory animus").

*Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 165-166 (6th Cir. 2004).

Plaintiffs proffered the following as circumstantial evidence of discrimination.  First, William Sayre, a Dolgencorp employee at The Plains store, overheard Veach telling another individual that males make better managers than females.  (Sayre Dep. 10).  Second, Veach told Katie Wolf, a Dolgencorp employee, that he would not promote her to store manager because she was a woman.  (Wolf Dep. 22-23).  Third, David Ogg, a greeting card merchant, overheard Veach telling someone else that if he had his way, he would only hire men.[2]  (Ogg Dep. 9-10). Fourth, Plaintiffs reiterate Buckley's belief that Veach ignored her and that he made Knight feel like a "nobody."  (Buckley Dep. 34, 36-40; Knight Dep.97-110, 143, 150).  Finally, Plaintiffs indicate that Wolf and Fran Yates-Brown ("Brown"), Buckley's sister who also worked for

---

[2] Although these statements may constitute direct evidence of discrimination, Plaintiffs only argue that the statements equate to circumstantial evidence of gender discrimination.  *See Wexler*, 317 F.3d at 571-572 (noting that stereotypes about a member of a protected class constitutes direct evidence).  As such, Plaintiffs present the statements within the context of the McDonnell Douglas triparte analysis. (Doc. # 26 at 12-27).  Thus, the Court will follow Plaintiffs' lead in this regard and will utilize the same framework to analyze Plaintiffs' claims under Title VII and Ohio Revised Code Chapter 4112.

Dolgencorp, felt like Veach refused to acknowledge them because of their gender.  (Wolf Dep. 22-23; Yates-Brown Dep. 17-19).

At the outset, the Court notes that Veach's role in the decision to terminate Knight is unclear.  As noted above, although Hager did not specifically recall Plaintiffs' termination at her deposition, she did testify that she would have worked with Veach and Sweat in making the decision to terminate Plaintiffs. (Hager Dep. 14, 18).  Sweat testified that she worked with Veach and Hager in deciding to terminate Buckley, but that she could not remember whether she participated in the decision to terminate Knight.  (Sweat Dep. 47-50, 62-63, 98).  Veach testified that he did not share his opinion that the Plaintiffs should be terminated with Sweat and Hager because of the "conflict" between him and Buckley.  (Veach Dep. 138).  However, Veach later testified that he told Sweat and Hager that Plaintiffs were bad managers.  (Veach Dep. 144).  In addition, Veach admitted that he agreed with Sweat when she indicated that she thought that the Plaintiffs should be fired.  *Id.* at 141.  Veach also testified that he had no authority to terminate Plaintiffs, and that Sweat and Hager made the decision to fire them.  *Id.* at 140-144, 149.  Sweat testified to the contrary when she stated that Veach participated in the decision to terminate Plaintiffs.  (Sweat Dep. 47).  A genuine issue of material fact therefore exists as to whether Veach, Plaintiffs' supervisor, took part in the decision to terminate Knight and Buckley.  If he did, his comments would be relevant.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-355 (6th Cir. 1998).  For purposes of the instant motion only, the Court will assume that Veach did participate in the decision to terminate Knight and Buckley.

With that assumption in mind and cognizant of the fact that Plaintiffs' *prima facie* burden is "not onerous" and "easily met," the Court concludes that Veach's alleged statements to Ogg,

16

Sayre, and Wolf, in combination with Plaintiffs' and Yates-Brown's comments about their interaction with Veach, constitute a significant enough amount of circumstantial evidence of discriminatory intent that necessitates bypassing the fourth element of Knight's *prima facie* case. Consequently, the Court holds that both Plaintiffs satisfied their *prima facie* case and the Court will proceed to determine whether Dolgencorp can produce a legitimate, nondiscriminatory reason for terminating Plaintiffs.

### B.     Dolgencorp's Legitimate, Nondiscriminatory Reason for Plaintiff's Termination

Dolgencorp has presented a legitimate, nondiscriminatory reason for firing Plaintiffs. It maintains that it fired Plaintiffs because of the high shrink level at, and the poor audit results from, The Plains Store.  (Doc. # 25 at 19-21).  Dolgencorp posits that Plaintiffs' failure to adhere to store policies, which may have contributed to the high shrink level at The Plains store, proves that Plaintiffs were not qualified to perform the essential functions of their jobs.  *Id.* Dolgencorp's desire to have its employees follow its polices and maintain low levels of shrinkage is certainly understandable.  In addition, the Court notes that Dolgencorp's burden is one of production, not persuasion.  *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003).  Thus, the Court holds that Dolgencorp's stated reasons for terminating Plaintiffs are legitimate, nondiscriminatory justifications for Plaintiffs' termination.  Dolgencorp has therefore presented sufficient evidence to "meet [Plaintiffs'] *prima facie* case of discrimination." *McDonnell Douglas*, 411 U.S. at 802.

### C.     Pretext

Plaintiffs now bear the burden of establishing that Dolgencorp's proffered reasons are pretextual.  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2001).  In order to do so,

Plaintiffs are "required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citing *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993) (quotation marks omitted)). The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are "factually false." *Manzer*, 29 F.3d at 1084. The third showing is also easily recognizable and ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. *Id.*

These two types of rebuttals are direct attacks on the credibility of the employee's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). As *Hicks* teaches, such a showing permits, but does not require, the fact-finder to infer illegal discrimination from the plaintiff's *prima facie* case.

Because Plaintiffs admit the high shrinkage and poor audit results, the first type of rebuttal is not at issue. (Buckley Dep. 95-97, 100 Knight Dep. 119-121, 139; Doc. # 26 at 8-9). Neither is the third type, as Plaintiffs concede that they could be fired for those reasons. (Buckley Dep. 48-50; Knight Dep. 81-82). Accordingly, the Court shall focus on the second type of showing–whether the Plaintiffs have proven by a preponderance of the evidence that Dolgencorp's proffered reasons did not actually motivate their discharge.

18

In the second showing, the plaintiff's attack on the credibility of the proffered explanation is an indirect one. *Manzer*, 29 F.3d at 1084.  In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. *Id.*  "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.*

To support their contention that their gender was a motivating factor in Dolgencorp's decision to terminate them, Plaintiffs proffer the same evidence they did for their *prima facie* case.  Specifically, Plaintiffs rely on the statements Ogg and Sayre allegedly overheard Veach make to other individuals as well as Veach's comment to Wolf.   Additionally, Plaintiffs direct the Court's attention to the deposition testimony of Plaintiffs, Wolf, and Yates-Brown wherein each woman indicates her belief that Veach ignored them because of their sex.  (Buckley Dep. 34; Knight Dept. 98-99; Wolf Dep. 22-23; Yates-Brown Dep. 17-19).  Because this evidence directly challenges the credibility of Dolgencorp's proffered explanation, Plaintiffs need not introduce additional evidence of gender discrimination.  *Manzer*, 29 F.3d at 1085; Doc. # 26 at 16.

In response, Dolgencorp essentially relies on the fact that Sweat and Hager participated in the decision to terminate Plaintiffs and that they were both women.  (Doc. # 30 at 6-7).  The Court noted above that a genuine issue of material fact exists as to who participated in the decision to terminate Plaintiffs.  Furthermore, the Court will not  rely on the idea that one member of a group is unlikely to discriminate against another member of the same group because that "inference has been explicitly rejected by the Supreme Court in the context of race

19

and sex discrimination." *Wexler*, 317 F.3d at 574 (citing *Oncale v. Sundowner Offshore Servs.,*
*Inc.*, 523 U.S. 75, 78 (1998)).

In sum, viewing the evidence in a light most favorable to Plaintiffs, the Court concludes
that Plaintiffs have presented sufficient evidence to permit a jury to reject Dolgencorp's
proffered reason for terminating Plaintiffs.  Thus, Dolgencorp is not entitled to judgment on
Buckley's Title VII claim and Buckley's and Knight's claims under Ohio Revised Code Chapter
4112.  The court **DENIES** Dolgencorp's motion on each of those claims.  (Doc. # 25).

## V.    PUBLIC POLICY CLAIM

Lastly, Dolgencorp moves for summary judgment on Plaintiffs' wrongful discharge in
violation of Ohio public policy claim.  (Doc. # 25).   To establish such a claim, Plaintiffs must
show that: (1) a "clear public policy existed and was manifested in a state or federal constitution,
statute or administrative regulation, or in the common law"; (2) in general, "dismissing
employees under circumstances like those involved in the plaintiff's dismissal would jeopardize
the public policy"; (3) the "plaintiff's dismissal was motivated by conduct related to the public
policy"; and (4) the employer did not have a justifiable "legitimate business justification for the
dismissal." *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529-30 (Ohio 2002) (citations omitted).
Further, the Ohio Supreme Court found that to prove the second prong of the above inquiry the
plaintiffs must show that there is no other recourse or remedy available:

> An analysis of the jeopardy element necessarily involves inquiring into the
> existence of any alternative means of promoting the particular public policy to be
> vindicated by a common-law wrongful discharge claim. . . . Where, as here, the
> sole source of the public policy opposing the discharge is a statute that provides
> the substantive right and remedies for its breach, "the issue of adequacy of
> remedies" becomes a particularly important component of the jeopardy analysis. .

20

. . Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

*Id.* at 531.

In *Carrasco v. Noamtc Inc.*, 124 Fed. Appx. 297, 304 (6th Cir. 2004) (unreported), the plaintiff asserted a claim for unlawful retaliation under Title VII, a claim for retaliatory discharge under Ohio Revised Code Chapter 4112, and a claim for wrongful discharge in violation of Ohio public policy.  *Id.* at 298.  The district court granted defendant's motion for summary judgment on the public policy claim and the Sixth Circuit affirmed that decision.  In so doing, the Sixth Circuit held "Because Carrasco has a remedy available to him under both Title VII and the OCRA, we find that he cannot have that same claim under Ohio common law."  *Id.* at 304.  In other words, the Sixth Circuit found that the jeopardy element had not been met and there was thus no need for a public policy claim. Consequently, the Court **GRANTS** Dolgencorp's motion for summary judgment on Plaintiffs' wrongful discharge in violation of Ohio public policy claim under *Carrasco*.  (Doc. # 25).

21

## CONCLUSION

The Court **DENIES** Dolgencorp's motion to strike (Doc. # 31) as well as Dolgencorp's motion for sanctions (Doc. # 34).

The Court **DENIES** Dolgencorp's motion for summary judgment on Buckley's Title VII claim as well as Dolgencorp's motion for summary judgment on Plaintiffs' Ohio Revised Code Chapter 4112 claims.  (Doc. # 25).

The Court **GRANTS** Dolgencorp's motion for summary judgment on Plaintiffs' public policy claims.  (Doc. # 25).

**IT IS SO ORDERED.**

    **s/ Gregory L. Frost**

**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**